*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TARA BACCI FABER,

        Plaintiff/Counterdefendant-Appellee,

v

CHRISTOPHER ROBERT FABER,

        Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
January 16, 2025
3:33 PM

No. 371050
Marquette Circuit Court
Family Division
LC No. 2022-061994-DM

Before: PATEL, P.J., and MURRAY and YATES, JJ.

PER CURIAM.

Defendant appeals as of right a judgment of divorce entered after a bench trial. The court awarded approximately 135 overnights a year for defendant and 230 for plaintiff with their sons, BF and JF. The court also awarded spousal support for plaintiff in the amount of $2,000 a month for 60 months followed by $2,500 a month for 12 months. On appeal, defendant argues that the court erred by failing to hold an evidentiary hearing before entering an interim custody order; used an improper figure for defendant's income; improperly analyzed three of the child-custody best-interests factors; and improperly placed too much emphasis on defendant's extramarital affair in awarding spousal support. We affirm.

## I. STANDARDS OF REVIEW

As stated in *Stoudemire v Thomas*, 344 Mich App 34, 42-43; 999 NW2d 43 (2022):

> We apply three standards of review in custody cases. The great weight of the evidence standard applies to all findings of fact. A trial court's findings regarding the existence of an established custodial environment and regarding each custody factor should be affirmed unless the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law.

\* \* \*

-1-

In child custody cases, [a]n abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. [(Cleaned up).]

General findings of fact in a divorce case are reviewed for clear error. *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). We review an award of spousal support for an abuse of discretion. *Id*. "An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes." *Id*. "The trial court's findings of fact relating to an award of spousal support are reviewed for clear error." *Id*. "Special deference is given to the trial court's findings when they are based on the credibility of the witnesses." *Id.*

## II. INTERIM CUSTODY ORDER

Defendant argues that the court erred by failing to hold an evidentiary hearing before entering an interim custody order and thus a remand for a new hearing, with up-to-date information, is necessary. Because any error regarding the interim custody order was ultimately rectified, appellate relief is unwarranted.

When the parties were seeking a parenting-time schedule pending resolution of the divorce, the Friend of the Court made a recommendation of approximately "50/50" time for each party, with some adjustments to accommodate defendant's work schedule as a physician.[1] The court did not follow the recommendation. Instead, the court ordered parenting time for defendant "every weekend," with "a third overnight" every other week. The parties then agreed to change the schedule into longer "lump[s]" of time for defendant with the children, essentially rearranging how the temporarily awarded parenting time was exercised. The result was that defendant ended up having the children in "five-day blocks" "twice per month."

Because custody was disputed, defendant argues that the trial court erred by not holding a hearing, analyzing the established custodial environment (ECE), or going through the child-custody best-interests factors before entering the interim custody order. He also complains that the trial court interviewed the children before entering the temporary order and asserts that the court's statements on the record suggest that it placed too much emphasis on whatever the children said *in camera*.

In *Mann v Mann*, 190 Mich App 526, 529-533; 476 NW2d 439 (1991), the Court concluded that, when custody is contested, it is erroneous for a trial court to enter even a temporary order without considering evidence such as live testimony. See also, generally, *Kuebler v Kuebler*, 346 Mich App 633, 672; 13 NW3d 339 (2023). Defendant contends that, under *Fletcher v Fletcher*, 447 Mich 871, 889; 526 NW2d 889 (1994) (opinion of BRICKLEY, J.), a remand for a new hearing, with up-to-date information, is therefore necessary. However, in *Mann*, 190 Mich App at 533, this Court stated that the failure to hold a hearing was harmless because a proper hearing was eventually

---

[1] Plaintiff would get slightly more time with the children as a result of defendant's work schedule.

held. In this case, the trial court conducted a proper bench trial, considered all the best-interests factors, interviewed the children once again, and made all necessary findings. Accordingly, the error was rectified.

Defendant cites *O'Brien v D'Annunzio*, 507 Mich 976 (2021), a Supreme Court order wherein the Court stated that improperly altering a child's ECE could result in an error that is impossible to rectify. See also *Daly v Ward*, 501 Mich 897, 898 (2017) (emphasizing that trial courts must "fully comply with MCL 722.27(1)(c) before entering an order that alters a child's established custodial environment" and failure to do so could be "difficult—if not altogether impossible—to effectively remedy on appeal[.]"). The trial court's temporary custody order in *O'Brien* "suspended the [mother's] parenting time, precluded her from initiating contact with the children, and continued granting the [father] full-time parenting time[,]" which the Supreme Court reasoned had the effect of modifying the children's ECE. *Id*. at 977. It was approximately 15 months before an order "properly based on an evidentiary hearing" was entered. *Id*.

*O'Brien* and *Daly* are distinguishable. Here, the children had an ECE with both parents before the separation and they also had an ECE with both parents after the entry of the temporary order. Indeed, the trial court stated as much in its findings. During the bench trial, the court considered "up-to-date information, including the children's current and reasonable preferences," and conducted the proper proceedings. *Fletcher*, 447 Mich at 889. In essence, defendant has already obtained the relief he claims *Fletcher* requires.[2] A reversal or remand is unwarranted.

## III. BEST-INTERESTS FACTORS

Defendant argues the trial court's findings regarding best-interests factors (a), (f), and (k) were against the great weight of the evidence. We disagree.

First, defendant contests the court's conclusion regarding factor (a), which refers to "[t]he love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The court stated that there were some "troubles with the emotional ties" between defendant and the children and that plaintiff was "slightly favor[ed]" on this factor. The evidence did not "clearly preponderate[] in the opposite direction" of this finding. *Stoudemire*, 344 Mich App at 42 (cleaned up).

The children's therapist testified that the boys were anxious and fearful at times and that defendant was the source of the anxiety. Both boys had expressed that they were "[n]ot being heard" by defendant. The therapist stated, "[T]hey'll express how they're feeling and then [be] told that that's not true by the father." The therapist said, "So it's almost like denying what they're feeling." The therapist stated that the boys managed other anxiety-provoking situations, such as school pressure, well, but had "overwhelm" in regard to their relationship with defendant.

---

[2] We note that the case of *Butters v Butters*, 342 Mich App 460; 995 NW2d 558 (2022), cited by defendant, has been vacated in part by the Supreme Court. *Butters v Butters*, 510 Mich 1096; 982 NW2d 173 (2022). The Supreme Court stated that when a court revisits a custody decision, it must use up-to-date information. *Id*. at 1097. Again, this is what the trial court did at the bench trial.

Plaintiff stated that she had not seen signs that the boys' relationship with defendant was improving as a result of family counseling. She said that the boys seemed more anxious after the five-day blocks they spent with defendant. She contended that "a little reduction" in the parenting-time blocks for defendant would "be beneficial long-term" for the relationship between defendant and the children. She opined that defendant's "patience isn't there long-term and things get volatile towards the end [of the blocks]." Plaintiff provided examples of interactions she observed between defendant and the boys that she would characterize as being "verbally abusive." Similarly, plaintiff's sister said that defendant could "be a little short tempered" with the children. All this testimony adequately supported the court's findings on factor (a).

Defendant also takes issue with the court's conclusion that plaintiff was favored on factor (f), which deals with "[t]he moral fitness of the parties involved." MCL 722.23(f). He contends that the trial court improperly relied on the fact that he had an extramarital affair. Defendant cites *Fletcher*, 447 Mich at 886-888, wherein the Court stated that an affair of which the children were not aware was not pertinent to factor (f). Defendant's argument and reliance on *Fletcher* are not persuasive. First, defendant omits a significant portion of the trial court's analysis of factor (f). The court relied, in part, on the fact that defendant had not been sufficiently transparent with his counselor, stating that "it was clear" that defendant "had not been honest and open with his private counselor" and had sought counseling in order to present a positive picture to the court. The court said that it was troubled that defendant had "spent time and effort to create unreliable testimony from a third party." Defendant does not make an argument on appeal about this aspect of the court's findings.

In addition, when mentioning the affair, the trial court was not concerned with the affair itself but with how defendant reacted when plaintiff asked him about it. Defendant reacted by denying the affair and calling plaintiff "horrible" for accusing him.[3] Defendant claimed that plaintiff, by asking whether he was alone on the night in question, was "accusing him of doing something that he would never do." Plaintiff testified that defendant told her that she "should tell [her] therapist how horrible [she was] to think [defendant] was having an affair." He sarcastically showed her a picture of a rabbit in the backyard and said it was his "girlfriend." The court, in its findings on factor (f), stated that defendant's manipulation tactics were likely to affect the children negatively. This was not improper and did not run afoul of *Fletcher*. The evidence did not "clearly preponderate[] in the opposite direction" of the court's findings regarding factor (f). *Stoudemire*, 344 Mich App at 42 (cleaned up).

Additionally, defendant contests the trial court's conclusion that plaintiff was favored on factor (k), which deals with "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). Once again, the evidence did not "clearly preponderate[] in the opposite direction" of the court's findings. *Stoudemire*, 344 Mich App at 42 (cleaned up). Plaintiff said that defendant was angry when he learned that she had filed for divorce. That night, he woke her three times. The first time, he "scream[ed] in [her] face," asking for the name of her lawyer. The second time, he saw that she was recording him with her telephone, so he took the telephone, deleted the recording, and pushed her. Another night, after defendant had

---

[3] The trial court got the timing of the "horrible" statement wrong, but this timing error is harmless.

removed the doorknob of the door to the room she had been using as her bedroom, plaintiff decided to put a new doorknob on. Subsequently, defendant pounded on the door and seemed to be trying to hit it with something, and plaintiff recorded the interaction with her telephone. Defendant then used an oscillating saw to cut off the doorknob. Plaintiff was trapped inside the bedroom "because the mechanism that would allow [her] to unlock the door was cut off." Plaintiff telephoned a friend for help, but then defendant "removed the trim" from the door so that it could be opened, took plaintiff's telephone, and threw it on the floor. The children were home at the time, and defendant acknowledged that it had not been good to expose the boys to the sawing incident.

Another time, defendant was frustrated about some missing paperwork and told plaintiff in front of the children that he was going to "choke her." Yet another time, he got angry when plaintiff questioned him about why his family but not hers was invited to a gathering, and he swore at her, threw her telephone into a toilet, and woke BF up and told BF that plaintiff was "a horrible person." Another time, defendant got angry with plaintiff, told her to "get the f*ck out" of the bed, and kicked her until she fell off the bed. She tried to go back to sleep on the bed and he did it again. Plaintiff explained that the house is "open concept" and that, the next day, the children said something that made her believe they had overheard the incident. Also, in May 2022, JF said that he was being "traumatized" by defendant and said that defendant had grabbed his neck and blamed JF for his problems. The court's conclusion regarding factor (k) was well-supported.

Defendant has established no basis for reversing the trial court's custody determination.

## IV. DEFENDANT'S INCOME

Defendant contends that the trial court, in analyzing spousal support and in signing the child-support order, used an incorrect income because defendant had switched jobs and made less at Munising Memorial Hospital (MMH) than he had made at Order of St. Francis Hospital (OSFH).

"In determining the appropriate amount of child support, a trial court must presumptively follow the Michigan Child Support Formula (MCSF)." *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011) (cleaned up). The initial step in deciding child support is to determine each party's net income. *Id*.

Defendant testified that he earned, on average, $193 an hour at MMH. He testified that, every other week, he worked approximately 30 hours in a clinic setting earning $185 an hour. In addition, he testified that, every month, he worked three 24-hour shifts in the emergency room earning $200 an hour. He further testified that he was on course to make approximately $330,000. Considering defendant's testimony, the trial court's use of $300,000 as defendant's yearly salary for purposes of spousal support appears to be an underestimate.[4] No error is apparent regarding the valuation of defendant's salary.

---

[4] In calculating child support, the Friend of the Court used a higher amount for defendant's income than the court had mentioned in calculating spousal support. The Friend of the Court noted that defendant had additional income from "Self-Employment or 1099." This is likely a result of

## V. SPOUSAL-SUPPORT FACTORS

Finally, defendant contends that the trial court erroneously analyzed two of the spousal-support factors by attributing the breakdown of the marriage to defendant's affair. We disagree.

MCL 552.23(1) states:

> Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

As stated in *Woodington*, 288 Mich App at 356:

> The objective of spousal support is to balance the incomes and needs of the parties in a way that will not impoverish either party, and support is to be based on what is just and reasonable under the circumstances of the case. Among the factors that a court should consider are (1) the past relations and conduct of the parties; (2) the length of the marriage; (3) the abilities of the parties to work; (4) the source and the amount of property awarded to the parties; (5) the parties' ages; (6) the abilities of the parties to pay support; (7) the present situation of the parties; (8) the needs of the parties; (9) the parties' health; (10) the parties' prior standard of living and whether either is responsible for the support of others; (11) the contributions of the parties to the joint estate; (12) a party's fault in causing the divorce; (13) the effect of cohabitation on a party's financial status; and (14) general principles of equity. [Citation omitted.]

Defendant contends that the trial court erred in analyzing factors (1) and (12) because, while defendant had an affair, it was "one isolated indiscretion" and was not the cause of the breakdown of the marriage. The court did not speak about the affair causing the breakdown of the marriage on factor (1). Instead, the court stated that defendant had been emotionally manipulative toward plaintiff, noting that defendant had called plaintiff "horrible" for accusing him of having an affair, when in fact he *had* had an affair. For factor (12), the court stated that although there had been "issues" during the marriage, the "culminating issue" was the "infidelity and deception" of defendant.

At trial, defendant averred that the marriage was essentially over in 2019, i.e., long before plaintiff discovered him with another woman. But he admitted that plaintiff engaged in extended

---

defendant's contract work with another hospital. Importantly, defendant does not argue on appeal that the Friend of the Court improperly valued the self-employment monies but focuses on his new job at MMH, stating that he was making "significantly less" than at OSFH.

marriage counseling with him and that the two remained together until 2022. And plaintiff stated that she put a sincere effort into saving the marriage. Plaintiff acknowledged that she and defendant had previously had a conversation about possibly divorcing. The parties stopped being intimate in May 2022, after plaintiff discovered that defendant had been texting another woman. However, they often still slept in the same bed. Defendant asked plaintiff to give him a chance to change. Defendant denied having affairs, and plaintiff said that she "was wanting to believe it." When plaintiff was asked what led her to file for divorce, she stated that "the big issue" was that she "got confirmation of an affair" in October 2022 while she was out-of-town with BF and JF. Considering this evidence, and deferring to the trial court's factual findings that are based on witness credibility, we are not left with a definite and firm conviction that the trial court made a mistake in its factual findings for factors (1) and (12). See *Woodington*, 288 Mich App at 355.

Affirmed.

/s/ Sima G. Patel
/s/ Christopher M. Murray
/s/ Christopher P. Yates